IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO.  RDB-03-090 |
| | * | |
| EN-WEI ERIC CHANG, | * | |
| | * | |
| Defendant. | * | |

*******

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The Defendant, En-Wei Chang, is not a victim of mass incarceration as he claims; he conspired—and aspired—to be an arms dealer to Iran. He did so to enrich himself, with no regard for the damage he could do the security of the United States of America, of which he was (and is) a citizen. He sought to purchase for Iran guided missile launchers for combat aircraft, a Super Cobra Attack Helicopter, and an anti-submarine radar surveillance system. And when he was discovered, he evaded justice for twenty years. He deserves a sentence consistent with the Guidelines in this case, and as proposed by the PSR, of 46 months incarceration.

1. **En-Wei Chang Conspired to Send Defense Articles to Iran**

    a. *Cavity-Backed Spiral Antennas Are Used by Military Aircraft to Locate and Track Enemy Radar Systems.*

The Defendant begins his sentencing memorandum by claiming that he has pled guilty "to a conspiracy to violate the Iran *Trade Embargo*." ECF 68, at 7 (emphasis added).  That is incorrect. As Mr. Chang's plea clearly states, he pled guilty to conspire to violate 18 U.S.C. § 2778, "Exportation of *Defense Articles*." ECF 62, at 1. This was not just a "Trade Embargo." In particular, an element of his offense is that he sought to export a "defense article." ECF 62, at 8. And not just any defense article: spiral cavity-backed antennas that were included on the United States Munitions List. ECF 28, at 8. As detailed in the Statement of Facts, Mr. Chang sought to

purchase "cavity-backed spiral antennas with military applications, including related to the *detection and surveillance of ground-based radar*." ECF 68, at 12. These antennas are serious business: "The cavity backed spiral antenna is a common electronic warfare antenna." Kent Britain, *More Electronic Warfare Antennas*, Popular Communications, February 2011 available at https://www.worldradiohistory.com/Archive-Popular-Communications/00s/Popular-Communications-2011-02.pdf. Such antennas allow an aircraft to figure out "direction and . . . distance" of enemy radar. *Id.* They allow a plane to get a "good idea" of which radars are being used defensively. *Id.* And these antennas are critical in determining whether a "radar is tracking" an aircraft. *Id.* In other words: Mr. Chang sought to send Iran antennas that would allow combat aircraft to identify where enemy radar was, and whether they were being tracked.

      b.  *Mr. Chang Sought a Host of Additional Dangerous Weapons to Send to Iran.*

Not content with sending antennas that would allow Iranian military aircraft to detect and track enemy radar, Mr. Chang eagerly sought a veritable hoard of materials that have only military application, and had the potential to do grave harm in the hands of Iran.

      i.      <u>Super Cobra Attack Helicopter</u>

Consider, for example, the twin-engine Super Cobra Attack Helicopter Mr. Chang sought pricing information for on July 18, 2002.  This was the Marine Corps' "go-to attack helicopter." *See* Philip Athey, *Marine Corps Says Goodbye to the Supra Cobra*, MilitaryTimes, October 20, 2020, available at  https://www.militarytimes.com/news/marine-corps-times/2020/10/20/marine-corps-says-goodbye-to-the-super-cobra/:



*Supra Cobra Attack Helicopters*[1]

These combat helicopters were operated by the Marine Corps in Operation Iraqi Freedom, Operation Enduring Freedom, the Gulf War, and Mogadishu. *Id.* These attack helicopters can carry a Gatling cannon, air-to-ground rockets, Hellfire Missiles, and Sidewinder Missiles. *See AH-1W Super Cobra,* available at https://www.military.com/equipment/ah-1w-super-cobra. In addition, Mr. Chang sought to purchase ten turrets for Cobra attack helicopters. ECF 62, at 7.  This was a weapon of war.

    ii.    <u>LAU-117 Maverick Missile Launcher</u>

Mr. Chang also sought purchase information for a LAU-117 (Maverick Missile Launcher) on November 18, 2002. ECF 62, at 13. The Maverick Missile Launcher provides "mechanical and electrical interface between the aircraft and the missile," and allows the AGM-65 missile to be launched from aircraft. *See* Marvin Engineering Company, LAU-117, available at https://marvineng.com/product/lau-117-maverick-missile-launcher/. The AGM-65 missile is a

---

[1] Photo source: https://www.cr.navair.navy.mil/product/AH-1W-Super-Cobra

"tactical air-to-surface guided missile" with a "high probability of strike against a wide range of tactical targets, including armor, air defenses, ships, transportation equipment, and fuel storage facilities." *See* United States Air Force, AGM-65 Maverick, available at https://www.af.mil/About-Us/Fact-Sheets/Display/Article/104577/agm-65-maverick/. Over 5,000 Maverick Missiles were employed during Operation Desert Storm, mainly attacking armored targets. *Id.* "Mavericks played a large part in the destruction of Iraq's significant military forces." *Id.* These too are a weapon of war:



*LAU-117 Launcher and Maverick Missile*[2]

    iii.    <u>Anti-Submarine Warfare Radar Equipment</u>

On April 21, 2002, Chang wrote to "request searching radar for military use," and specified four particular types of anti-submarine radar. *See* ECF 62, at 12. The APS-705, which Chang specifically asked for, is a "navigation and search radar used for anti-submarine warfare (SAW) mapping." *See* MM/APS-707, available at

---

[2] Source: https://man.fas.org/dod-101/sys/ac/equip/lau-117.htm

https://www.militaryperiscope.com/weapons/sensorselectronics/airborne-radars/mmaps-705/overview/. According to publicly-available information, there are only two countries in the Middle East besides Iran that have submarines: Israel and Egypt. *See* https://en.wikipedia.org/wiki/List_of_submarine_operators.[3]

    iv.    <u>Night Vision Goggles for Pilots</u>

On July 9, 2002, Chang sought purchase information on 20 pairs of military-grade night vision goggles for use by pilots. At that point in time, the vast majority of military-grade night vision goggles were used for military applications. *See* Mark Huber, *Civilian Operators Clamor for Night-Vision Goggles*, AINOnline, December 28, 2007, available at https://www.ainonline.com/aviation-news/business-aviation/2007-12-28/civilian-operators-clamor-night-vision-goggles (noting that militaries buy "90 percent" of all night vision goggles). These too are military technology that he was seeking to smuggle to Iran.



*ANVS-9 Night Vision Goggles*[4]

---

[3] It is possible at the time that Libya also possessed submarines.
[4] Source: https://anvsinc.com/product/anvis-9-night-vision-binoculars/

2. **En-Wei Chang Was Critical to the Conspiracy's Success**

Chang argues that he was a "minimal participant" in the conspiracy. But that is belied by the facts. Chang was the main point of contact between defense companies in the United States and his co-conspirator who was in touch with Iran. It was Chang who reached out to U.S.-defense contractors in the first, place, and then kept in contact with them for over a year. ECF 62, at 11. And Chang emailed a real Maryland company that supplied satellite imagery – not an undercover agent. ECF 62, at 11. Thereafter, an undercover agent engaged with him.  During that year, Chang exchanged over 100 emails with the undercover agent, hardly a one-time minimal role.[5] And while Chang attempts to argue he wouldn't get paid for his work, ECF 68, at 12, that is misleading. First, after the initial delivery of the cavity-backed antennas, Chang hoped business would boom, and that he would make money off of the ensuing arms deals.  He proudly told the undercover agent that he hoped for a "10 million USD business [per] year if we can really do this." ECF 62, at 12. Chang aspired to be a profitable international arms dealer if all went as he planned.

What's more, Chang hoped to profit off the deals he was conducting. On March 27. 2002, Chang emailed about a "triangle export" deal that he could do, where "All we need to do" is "buy it and ship to wherever my customer wants us to ship to . . . and in each case usually we can make around 500 to $10,000 USD and between you and me we split 50/50:

> The business that we gonna do is call the "Triangle export" First I'll tell you what to buy and where to buy it, and after we know our cost we can start to calculate our profit of the item. Sometime my buyer will tell me how much they are willing to pay, so is up to us to cut the price from our supplier in the US. All we need to do is buy it and ship it to wherever my customer want us to ship to, all the shipping cost will be cover in the total price.  Basically we play a role of "Transport Station". If everything goes well this time, we will be getting orders pretty often, and each case usually we can make around 500 to 10,000 USD and between me and you we split 50/50.

---

[5] Due to size constraints the government does not attach all these emails, but if the Court wishes to review the Government will make them available.

Chang was very clear about what he was looking for: a baggage X-Ray machine of the type used at airports:

> * For the first deal: You will need to buy this item call the 'RAP520B-Exp' from ▮▮▮▮. This is a X-ray machine. Company# 310-▮ Fax# 310-▮ Ask for ▮▮▮, he is the sales i been contact with. I'll call him first to let him know I'm passing this onto you ok,, than you can call him up and talk detail with him. This unit suppose to cost us 27,500 USD, and we will sell this for 32,000 USD including shipping charge. (shipping charge is around 1500-1800 USD)  I'll try to get a better price for us, or maybe you can do that too ok.. (lower the cost, more profit for us hehe)

In other words, Chang wanted to send a baggage X-Ray machine via Turkey to Iran. And he was clear about why he wanted to do so: "lower the cost, more profit for us hehe." The type of baggage scanner Chang sought to purchase and ship to Iran is pictured below:[6]



Chang was the critical point of contact because of his language skills and familiarity with the United States. Chang was the critical point of contact who handled all of the negotiations with the United States, and he was fully aware that that it was illegal to ship the items he was seeking

---

[6] Source: https://www.wired.com/images_blogs/threatlevel/2014/02/RapiScan-522B.pdf

to Iran. ECF 62, at 13. He was seeking to profit, and he hoped to become a major player in an arms dealing conspiracy.

### 3. Mr. Chang is Not Entitled to a Role Reduction Even Under His Facts

Even if this Court credits the incorrect and factually unsupported argument that Chang makes, and finds he was merely an intermediary, Chang is still not entitled to a role reduction under the Guidelines.

A reduction under U.S.S.G. § 3B1.2 is called for only if the defendant is "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2, App. Note 3. Consider the analogous case of a "middle man" who simply facilitates drug sales. Such a "middle man" is not entitled to a decrease under 3B1.2. *See, e.g., United States v. Garcia*, 987 F.2d 1459, 1451 (10th Cir. 1993) (upholding sentencing court's refusal to grant a decrease where defendant was 'simply in the middle with a lot of people'"); *United States v. Santstevan*, 39 F.3d 250, 254 (rejecting argument that a defendant who was "only a 'middle man' who simply facilitated drug sales" was entitled to a role reduction); *United States v. Tremelling*, 43 F.3d 148, 153 (5th Cir. 1995) ("A role as a go-between does not warrant a finding of minor participation. [Defendant's] actions as the person who brought the buyers and sellers together for the transaction was critical to the offense."). Even if Chang was a mere middleman – which he was not—the guidelines do not support a role reduction.

Next consider the argument that Mr. Chang was "27 years old," and the claim that he was "younger" than his other co-conspirators. Mr. Chang was not a child, a minor, or even someone with a still-developing brain. 27 years old is old enough to know the law and it is old enough to understand tools of war. At the time of these crimes, Mr. Chang was older than John F. Kennedy was when he commanded PT-109. He was older than John McCain was when he was released

8

from imprisonment in Vietnam. And he was older than at least nine of the U.S. citizens taken hostage at the Iranian Embassy on November 4, 1979. *See* UPI, *List of Americans Known to Be Held Hostage in Iran,* available at https://www.upi.com/Archives/1981/01/18/The-following-list-of-Americans-known-to-be-held/2797348642000/.

### 4. The 3553(a) Factors Counsel In Favor of a Sentence of Incarceration

####   a.  *The Nature and Circumstances of the Offense*

The nature and circumstances of the offense are deeply serios. Mr. Chang conspired to ship munitions items to Iran. In particular, radar detection equipment for attack aircraft. And he conspired to do much more: purchase helicopters, night vision goggle, missile launchers, and gun turrets. He did this all because he hoped to make a personal profit by betraying the laws and potentially the security of his country, the United States of America.

####   b.  *Mr. Chang's History and Characteristics Favor a Significant Sentence of Incarceration*

Mr. Chang, a citizen of the United States, has spent the past 20 years living outside its jurisdiction hoping to avoid the reach of his country. In 2002, he was specifically told by agents that he should consider surrendering to the United States on the current charges, and that there could be significant benefits in doing so rather than waiting to be captured. ECF 62, at 13.

Instead, Mr. Chang refused to stand and take responsibility for his crimes in the United States. He was placed on the Department of Homeland Security's Most Wanted List. See HSI Baltimore Investigation Leads to Guilty Plea for 20-year Fugitive for Conspiring to Export Defense Equipment to Iran, available at https://www.ice.gov/news/releases/hsi-baltimore-investigation-leads-guilty-plea-20-year-fugitive-conspiring-export.

For twenty years Mr. Chang avoided prosecution, never once setting foot in the United States or even reaching out to try and resolve the issue. While he appears to have had success

since then as a restauranteur abroad, at no moment in the past two decades did he make any attempt to resolve these charges pending against him in a country where he had citizenship. Combined with the deplorable conduct of his attempts to become an international arms dealer, his consistent avoidance of justice until he was arrested on an international warrant twenty years later in Italy, speaks to his history and characteristics more loudly than any restaurant.

    c. *Deterrence Requires a Sentence of 46 Months*

Mr. Chang concedes that his case has garnered significant public attention. *See* ECF 68, at 26. What sort of message will it send to those who would seek to deal arms to Iran and other nations under embargos if Mr. Chang were to receive time served? To do so would essentially encourage rampant violation of American arms embargos, as long as the defendant could stay one step ahead of American law enforcement for two decades. If those around the world are watching this case, then general deterrence should be clear: evading the law does not render an individual immune. Even if you flee, you will be called to account for violating the laws and security of the United States. Deterrence is necessary to stop further violations by the others who may be waiting to see how the United States of America punishes those who evade its grasp for decades.

    d. *Avoid Sentencing Disparities*

Chang's co-defendant was sentenced to 24 months incarceration nearly two decades ago. First, that cuts against Chang's argument that he deserves a sentence of 351 days, since he would get a substantially lower sentence. More to the point, Chang's co-defendant cooperated with the government. He did not spend two decades on the lam. Mr. Chang should receive a greater sentence than his co-conspirator who cooperated 20 years ago. What's more, Mr. Chu was a citizen only of Taiwan. He did not violate the laws and Arms Embargo of his country for personal profit.

In contrast, Mr. Chang is a citizen of the United States. He violated the laws of his own country. And then he ran from it for 20 years. He deserves the sentence proposed by the PSR of 46 months.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____
Aaron S.J. Zelinsky
Robert I. Goldaris
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day, a copy of the foregoing Response was electronically filed via CM/ECF which provides notice to counsel of record.

                                                      _____/s/_____
                                                      Aaron S.J. Zelinsky
                                                      Assistant United States Attorney